Argued March 18, affirmed April 15, 1919.

## HIRTZEL v. DRAKE.

(179 Pac. 905.)

**Equity—Amendment to Conform to Proof.**

1. Where, in an action to have a trust declared in land deeded by a parent of the parties to defendant, the trial revealed evidence showing that the deed had never been delivered to defendant, the court properly allowed plaintiffs to amend their complaint to conform with the proof; defendant being granted time to meet the amended pleadings with answers and additional evidence.

**Trusts—Trust in Land—Evidence.**

2. In an action to have a trust declared in land deeded by a parent of the parties to defendant, evidence *held* sufficient to warrant a finding that the parent and the defendant had agreed that defendant should hold the title as a trustee for the benefit of all his children.

    [As to creation of trust in land by parol, see note in 115 Am. St. Rep. 774.]

**Deeds—Delivery—Evidence.**

3. In an action to annul a deed, evidence *held* sufficient to sustain a finding that the deed had never been delivered.

From Clackamas: JAMES U. CAMPBELL, Judge.

Department 1.

On December 21, 1914, John T. Drake executed a deed purporting to convey a farm, which he owned, to his son John H. Drake. The deed was recorded at the instance of John H. Drake on January 5, 1915. This suit resulted in a decree annulling the deed on the ground that it had never been delivered by the grantor. John H. Drake appealed.

John T. Drake and his wife, Elizabeth Drake, resided on the farm for a period of years until some time in 1914 when marital differences arose between them. The estrangement resulted in a divorce on November 13, 1914. John T. Drake paid $2,000 to Elizabeth Drake in full settlement of her property rights; and he retained the farm. The money used in making this payment was borrowed by John T. Drake and he secured it by mortgaging the farm. There is evidence indicating that John T. Drake was intensely embittered against his once wife. There are five children, of whom four are daughters and one is a son. Lois Hirtzel, Maude M. Pearl and Marguerite Drake, three of the daughters, are the plaintiffs, while John H. Drake, the son, and Goldie Marquam, the other daughter, are the defendants. The daughters, with the exception of Marguerite, are married and have homes of their own; Marguerite was in the hospital a portion of the time and, it may be inferred, was with one of her sisters some of the time; and consequently when his wife left, John T. Drake was alone on the farm. At some time, possibly as early as October, 1914, John T. Drake went to the home of his son, where he lived until the date of his death which occurred on January 4, 1915. Although John T. Drake had been sick and evidently

realized as early as the middle or latter part of November, 1914, that he could not live long, he did not become bedridden until about December 24, 1914.

After the death of their father some of the daughters caused an attempt to be made to persuade John H. Drake to sign a writing containing a declaration that he held the title to the farm in trust for himself and his four sisters equally; but upon his refusal to execute the declaration of trust Lois Hirtzel, Maude M. Pearl and Marguerite Drake, by her guardian, commenced this suit in June, 1915, against John H. Drake and, because their sister Goldie Marquam declined to be a voluntary party to the suit the plaintiffs also made her a defendant. The plaintiffs filed an amended complaint on April 15, 1916. They alleged in this amended complaint that at a time when John T. Drake realized that he was mortally ill and would soon die, John H. Drake and his wife, Orletta Drake, represented to John T. Drake and made him believe that if he died owning the farm his former wife would be enabled to make some demand against it; that it was the desire of John T. Drake to give the farm to his five children equally and that John H. Drake and Orletta Drake represented to him and made him believe that if he conveyed the land directly to the children his former wife, Elizabeth Drake would, as the mother of the minor daughter Marguerite, secure control over that child's interest; that John H. Drake and Orletta Drake represented to John T. Drake and caused him to believe that if he would convey the farm to John H. Drake it would avoid the expense of administering upon the estate and that John H. Drake would hold the land in trust for all the children equally and whenever he could obtain a reasonable price he would sell the farm and after paying

the debts would divide the surplus equally with the daughters; that John H. Drake and Orletta Drake, by making such representations, induced John T. Drake to execute the deed with the agreement, however, that John H. Drake should hold the title in trust for himself and his sisters equally.

Goldie Marquam filed an answer and cross-complaint which admits the allegations contained in the amended complaint of the plaintiffs and then reaffirms all those allegations.

John H. Drake answered the amended complaint of the plaintiffs and the cross-complaint of Goldie Marquam by denying the allegations of trusteeship and alleging absolute ownership in the farm. There were appropriate replies by the plaintiffs and the cross-complainant.

The parties appeared with their witnesses on June 22, 1916, and on that day evidence was introduced in behalf of the sisters as well as for the brother. There was evidence not only tending to sustain the allegations of trusteeship but also tending to show that John T. Drake had never lost dominion over the deed and that the instrument had never been delivered by him. Indeed, substantially all the evidence now relied upon to show nondelivery of the deed was given at that time. The plaintiffs and Goldie Marquam say that they did not know prior to June 22, 1916, that any witnesses would testify that the deed had never been delivered. Because of the evidence relating to the question of the delivery of the deed the plaintiffs asked for permission to file a second amended complaint and Goldie Marquam asked for permission to file an amended answer and cross-complaint; and subsequently on January 2, 1917, the court made an order permitting the amended

pleadings to be filed and allowing John H. Drake ten days within which to answer the amended pleadings.

A second amended complaint was immediately filed by the plaintiffs and at the same time Goldie Marquam filed an amended answer and cross-complaint. Each of these pleadings repeats the allegations which had been made in the first amended complaint and in the original cross-complaint relative to the trusteeship and then it is averred that John H. Drake and John T. Drake agreed that the latter should retain possession of the deed and if he should die owning the land then John H. Drake should take possession of the instrument and hold the title as trustee for himself and his sisters. The second amended complaint, and also the amended cross-complaint, concludes with an alternative prayer asking for a decree annulling the deed on account of nondelivery, or, if it be held that the deed was delivered, that the court adjudge that John H. Drake holds the title in trust for all the parties to the suit. On January 10, 1917, John H. Drake answered the second amended complaint of the plaintiffs and the amended cross-complaint of Goldie Marquam. In addition to admissions and denials John H. Drake reasserted in these answers his claim of absolute ownership.

The parties reassembled in court on March 24, 1917, and John H. Drake again testified in his own behalf and also called several witnesses who gave evidence for him. No additional witnesses were called in behalf of the plaintiffs or the cross-complainant.

AFFIRMED.

For appellant there was a brief over the name of *Messrs. Brownell & Sievers,* with an oral argument by *Mr. Charles T. Sievers.*

For respondents there was a brief over the name of *Messrs. Fulton & Bowerman,* with an oral argument by *Mr. Jay Bowerman.*

HARRIS, J.—1, 2. The court properly allowed the plaintiffs and Goldie Marquam to file amended pleadings to conform with the proof of nondelivery. Even though the rights of the parties had been decided on the evidence received on June 22, 1916, and under the pleadings as they were on that date, the evidence and pleadings were nevertheless sufficient to defeat John H. Drake's claim of ownership and to warrant the court in finding that the father and son had agreed that the son should hold the title as a trustee; but in addition to evidence of an agreement of trusteeship the trial revealed evidence showing that the title had not passed to John H. Drake at all, although John T. Drake and John H. Drake had made an agreement providing for a trusteeship on the mistaken assumption that John T. Drake could retain dominion over the deed and if he did not destroy it or did not sell the land the title would, at his death, pass to his son to be held by the latter as trustee. John H. Drake was not misled to his prejudice in maintaining his defense; and, moreover, he was granted and he availed himself of the right to meet the amended pleadings with answers and additional evidence.

3. The trial court found that John T. Drake did not intend to deliver the deed in his lifetime and that he did not deliver it to John H. Drake. This finding is amply supported by the evidence. Declarations made by John T. Drake to different persons prior to December 21, 1914, as to what he intended to do and a statement which he afterwards made as to what he had done; the testimony of the notary public who prepared

the deed and took John T. Drake's acknowledgment of it; the testimony of John H. Drake and his wife; and declarations made by John H. Drake after January 4, 1915, as to what his father had done; all combine to show as convincingly and conclusively as human testimony can show that John T. Drake retained dominion over the deed and did not deliver it.

Mrs. John Jeorg stated that in the fall of 1914 John T. Drake told her "he would sell the place if he could, or deed it to John and then divide it—if John sold the place to divide it equally among the children." Fred Myers testified that John T. Drake contemplated a conveyance to his son and that "the talk he and I had, John was to sell it and then divide it, after he paid off the mortgage." John Jeorg said that he heard John T. Drake say that "he would deed the property to John and he was to pay off the mortgage and divide the money equally among the children." John T. Drake stated to Olof Olsen that "he was going to deed his place to" his son John and that "John is going to sell the place and divide it among the children, to keep down administrator's fees." Besides the testimony of these disinterested witnesses it is recorded in the transcript that Lois Hirtzel told about her father once saying to her "I am going to treat you all the same." In the late summer or fall before his death Goldie Marquam's father said to her "I want to treat you children all alike." L. N. Jones, a friend and neighbor of John T. Drake, saw him three days before his death and at that time, in the language of the witness:

John T. Drake "told me what he had done with his property, and he said he had deeded his property to John—that is, he had deeded it but hadn't given the deed to John, it was in the house, and if he got well he would finish the business himself, but if he died he wanted John to record the deed and finish the business

up. * * He said John was to pay the debts, sell it, and divide it equally among the children.''

J. W. Hobart who prepared the deed and before whom John T. Drake acknowledged its execution, testified:

That John T. Drake said that he wanted to make a deed ''so as to avoid administration expenses''; he said ''he thought he would make a deed to'' John H. Drake ''and put that deed then in the hands of the cashier of the Bank, * * and in case that he was so that during his lifetime he could sell the property he could destroy it and make a deed direct to the parties to whom he sold it. And in the event he didn't that John could take it then, and that he was to sell the property and pay off the indebtedness and divide the net proceeds equally among the children.''

Hobart stated:

That he then informed John T. Drake that the delivery of a deed to a third party ''was a sufficient delivery to make it irrevocable''; and that thereupon John T. Drake said ''that he did not want it that way, that he would make a deed, though, to John, and put it in a vault in the Bank—rent a vault in the Bank and put it in there so that he could get it out himself and destroy it and make another deed in case he sold the property during his lifetime. And I said to him then * * if you do that and you should die John would have the deed, then have it recorded, his mortgage off, and, says I, it would be his property. 'No,' says he, 'that is not the understanding. The understanding is that he is to sell the property and pay the indebtedness off and divide the proceeds equally among the rest of the children.' ''

Continuing with his testimony, Hobart stated that after the deed was signed and witnessed and while John T. Drake had the deed in his hand he (Drake) said to George Thomas, one of the witnesses to the deed:

"George, this is my paper. I am going to put it in the bank so I can get it at any time I choose."

The following is a part of the cross-examination of John H. Drake:

"Q. What did your father say the night Mr. Hobart was there about putting this deed in the bank?

"A. They talked about putting it in there, but anyhow they decided to keep it there; it was his piece of paper and he intended to keep it, and if he sold the property he would tear it up and destroy it.

"Q. You didn't get hold of the deed and record it till after he died?

"A. No, sir.

"Q. He still had it until he died?

"A. Yes, sir."

Orletta Drake admitted that John T. Drake "was trying to sell his farm all the time he was alive" and that if he could have made a sale "he would have signed the deed"; that, referring to the deed after its execution, he said, "This is my paper, and in case I die it is John's" and "if he lived he would take the deed and tear it up and use the money for his own benefit."

In February, 1915, John H. Drake went to the office of F. M. Brooks for the purpose of paying a bill incurred in caring for Marguerite during an attack of typhoid fever. The following excerpt from the testimony of F. M. Brooks is significant:

"He asked me to reduce my bill as much as possible; that the father had deeded him property, the place—it was deeded to him and he intended to sell it as soon as possible and after it was sold he intended to divide the money equally among the children, his included, and I made a reduction on the bill at that time because of that."

Maude M. Pearl, Lois Hirtzel and Goldie Marquam all say that a few days or weeks after the funeral they met with their brother and he told them at that time that the farm had been deeded to him to save expense of administration and that "he was to have the personal property for taking care of" his father.

The deed was placed in the library table in the house of John H. Drake instead of being deposited in the bank. The instrument was executed in the home of John H. Drake while John T. Drake was living there. The act of placing the deed in the library table was described by Orletta Drake as follows:

"After he signed the deed and they were all gone Mr. Drake sealed it up in an envelope and he said, 'I will give it to you to put away,' and I said, 'I will put it in the library table,' and he said, 'All right.' It was there till after he died."

Referring to the circumstance of the deed being placed in the library table, John H. Drake said his father asked Orletta Drake "where he should put it. She took the deed and he went with her and they put it in there and he knew right where it was and it stayed there until he died." The record contains the following questions by the court and answers by the defendant John H. Drake:

"Court: And when it was in that library table could he go and get it at any time he wanted to?

"A. Yes, sir: it was right there. He went with my wife when they put it in there, and he could have had it any time he wanted it.

"Court: That is the way you understood it at the time he put it in there?

"A. Yes, sir: that is the way I understand it. He said 'If anything happens to me that deed is to be recorded immediately.' He said 'If I die this is yours.'

"Court: That is, if he died?

"A. Yes, sir.

"Court: In the meantime he said it was his until he did die?

"A. Yes, sir.

"Court: You are quite sure there is no mistake about that?

"A. Yes, sir; I am sure there is no mistake about that."

When testifying at the second hearing on March 24, 1917, John H. Drake claimed that his father gave him the deed on December 24, 1914, and requested that he record the instrument; that the witness gave the deed to his father-in-law who kept it "a week or ten days" and then took the paper on January 5, 1915, to the county recorder's office for recording. It will be recalled, however, that on June 22, 1916, when telling about the deed having been placed in the library table, John H. Drake said that the paper "stayed there until he [John T. Drake] died"; and it will also be remembered that Orletta Drake testified that "it was there till after he died."

The decree appealed from is affirmed. AFFIRMED.

McBRIDE, C. J., and BURNETT and BENSON, JJ., concur.